1

**RAINES FELDMAN LITTRELL LLP**
Kyra E. Andrassy (SBN 207959)

2
kandrassy@raineslaw.com
3200 Park Center Drive, Suite 250

3
Costa Mesa, CA 92626
Telephone: (310) 440-4100

4
Facsimile: (310) 691-1943

5
**WITHERS BERGMAN LLP**
Samantha Klein (SBN 222414)

6
samantha.klein@withersworldwide.com
Conte Cicala (SBN 173554)

7
Conte.cicala@withersworldwide.com
10250 Constellation Blvd, Suite 1400

8
Los Angeles, California 90067
Telephone:    310.277.9930

9
Facsimile:    310.277.9935

10
Attorneys for Defendant Arash Asante Bayrooti

11
**UNITED STATES BANKRUPTCY COURT**

12
**CENTRAL DISTRICT**

13
**SANTA ANA DIVISION**

14

| | |
|---|---|
| In re: | Case No.: 8:23-bk-10571-SC |
| LITIGATION PRACTICE GROUP P.C., | Adversary Case No. 8:24-ap-01068-SC |
| Debtor. | Chapter: 11 |
| RICHARD A. MARSHACK, Chapter 11 Trustee, | **OPPOSITION TO EMERGENCY MOTION FOR APPLICATION FOR A RIGHT TO ATTACH ORDER AND ISSUANCE OF WRIT OF ATTACHMENT OR, ALTERNATIVELY, FOR A TEMPORARY PROTECTIVE ORDER PENDING A NOTICED HEARING** |
| Plaintiff, | |
| v. | |
| ARASH ASANTE BAYROOTI, | Date:       August 15, 2024 |
| Defendant. | Time:       1:30 |
| | Place:      Courtroom 5C |
| | 411 West Fourth St. |
| | Santa Ana, CA 92701 |

15
16
17
18
19
20
21
22
23
24
25

**TO THE HONORABLE SCOTT CLARKSON, UNITED STATES BANKRUPTCY**

26
**JUDGE, AND RICHARD A. MARSHACK AND HIS COUNSEL:**

27

28

10301465.2

Arash Asante Bayrooti is an individual living with his family in Orange County who, a number of years ago, had the misfortune of going into business with Tony Diab, the mastermind behind Litigation Practice Group, P.C.  Based on (1) a declaration replete with conclusory statements, hearsay, and lacking foundation and (2) an allegation that in May 2023, before he was aware that there were allegations that he had received a constructively fraudulent transfer, the Defendant put title to a home (the "Property") into a revocable trust where he is the trustee and the beneficiary, Richard Marshack, the chapter 11 trustee (the "Trustee") for Litigation Practice Group, P.C. ("LPG") seeks to attach the Property and, much worse, to attach and freeze Mr. Bayrooti's bank accounts, which would prevent him from paying for his family's living expenses and defending himself in this litigation.  This is not due process and is procedurally, factually, and substantively unwarranted.

The Application should be denied because:

(1)    there is absolutely no justification to have it heard on an emergency basis;

(2)    it is not supported by sufficient and admissible evidence by someone with personal knowledge;

(3)    this is not a breach of contract claim;

(4)    the requirement that Mr. Bayrooti be engaged in a business, trade, or profession is not satisfied;

(5)    the Trustee has failed to establish the probable validity of his claims and, in fact has submitted no evidence of insolvency at the relevant time; and

(6)    the timing and deficiencies in the Application evidence that the Application was filed in an attempt to put pressure on Mr. Bayrooti to improve his last settlement offer and was therefore filed for an improper purpose.

## I.    FACTUAL BACKGROUND

The Trustee filed his complaint against Mr. Bayrooti on June 4, 2024, approximately nine months after initially reaching out to Mr. Bayrooti to open a settlement dialogue, which dialogue has been ongoing.

2

1    The complaint seeks to avoid a payment of $5,814,146.45 that LPG made to Mr.

2    Bayrooti from a trust account in September 2022 to satisfy a guarantee that LPG had entered

3    into in June 2021.  The guarantee was of Mr. Diab's obligation to pay $7,130,000 to Mr.

4    Bayrooti in exchange for Mr. Bayrooti's stock in B.A.T., Inc. dba Coast Processing ("Coast

5    Processing").   The Trustee amended the complaint on July 12, 2024, and as set forth in the

6    *Plaintiff's Status Report Related to Defendant:  Arash Asante Bayrooti*, served the amended

7    complaint on August 13, 2024.  The amended complaint added a claim under 11 U.S.C.§ 544

8    and Cal. Civ. Code § 3439.05 and attached a handful of exhibits that were not attached to the

9    original complaint.  Discussions between counsel were ongoing as recently as late June.

10

11   **II.    RELIEF IS NOT WARRANTED ON AN EMERGENCY BASIS**

12       To be entitled to relief on an emergency basis, Local Bankruptcy Rule 9075-1(a)

13   requires that the application "be accompanied by the declaration of one or more competent

14   witnesses under penalty of perjury that (i) justifies the setting of a hearing on less than 48

15   hours notice and (ii) supports the granting of the motion itself on the merits."  The Trustee also

16   notes in the Application that California Civil Code § 485.010(a) permits the filing of an *ex*

17   *parte* application for a writ of attachment only where "great or irreparable injury would result

18   to the plaintiff if issuance of the order were delayed until the matter could be heard on notice."

19   Cal. Civ. Code § 485.010(a).

20       The Trustee's declaration in support of the Application fails to justify the setting of this

21   hearing on an emergency basis and, for the reasons set forth below, does not support the

22   granting of the Application on the merits.  With respect to exigent circumstances, the Trustee

23   alleges the following, without any further basis: (1) the Trustee is "concerned that the

24   Accounts are highly liquid assets that may be readily transferred or concealed, thus creating an

25   immediate danger that they will not be available for levy"; (2) the Trustee is informed that in

26   May 2023, Mr. Bayrooti transferred title to the Property to The Arash Bayrooti Living Trust

27   which he alleges is a revocable trust with Mr. Bayrooti as the trustee and beneficiary; and (3)

28

OPPOSITION
10301465.2

the Trustee is concerned that the Property will be transferred, sold, encumbered or otherwise made unavailable.

The Trustee's "concerns" either have no basis in fact or are purely conjectural and the declaration is notable for what it does not contain.  There is no evidence, nor could there be, that Mr. Bayrooti has previously engaged in any fraudulent conduct, has threatened to conceal or transfer assets, listed the Property for sale, transferred the Property to a third party, or engaged in any other conduct that would justify the Trustee's concerns.  On the contrary, since Mr. Bayrooti became aware of the Trustee's claims in September 2023, he has retained counsel who has engaged with the Trustee in settlement discussions, both before and after the filing of the complaint.  Indeed, the fact that this action has been pending for more than two months with the Trustee only now deciding to seek a writ of attachment order on 48 hours' notice, without any change in circumstance, belies any contention that emergency relief is warranted.  There is not only not "substantial evidence" that Mr. Bayrooti's assets are or will be concealed or transferred—there is no evidence whatsoever.  Speculative injury is not irreparable injury.

There is no justification to hear the Application on an expedited basis, particularly where Mr. Bayrooti has not yet been formally served with the first amended complaint, has not appeared in this action prior to filing this Opposition, has not met and conferred with the Trustee, and has not had the opportunity to conduct any discovery to support his anticipated defenses to the Trustee's claims.   But, even if there were grounds to hear the Application on an emergency basis, for the reasons set forth below, the Application is not supported by the law or the facts.

III.    **THE TRUSTEE HAS NOT ESTABLISHED ALL OF THE ELEMENTS REQUIRED TO OBTAIN A WRIT OF ATTACHMENT**

Under California Civil Code § 484.010, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7064, a plaintiff in an action may apply to the court

for a writ of attachment by filing an application for the order and writ.  As relevant here, the application must be executed under oath and include the following:

> (a) A statement showing that the attachment is sought to secure the recovery on a claim upon which an attachment may be issued.
> (b) A statement of the amount to be secured by the attachment.
> (c) A statement that the attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based.
> (d) A statement that the applicant has no information or belief that the claim is discharged in a proceeding under Title 11 of the United States Code (Bankruptcy) or that the prosecution of the action is stayed in a proceeding under Title 11 of the United States Code (Bankruptcy).
> (e) A description of the property to be attached under the writ of attachment and a statement that the plaintiff is informed and believes that such property is subject to attachment. . . .  Where the defendant is a natural person, the description of the property shall be reasonably adequate to permit the defendant to identify the specific property sought to be attached.

Cal. Civ. Code § 484.020.  The application "shall be supported by an affidavit showing that the plaintiff on the facts presented would be entitled to a judgment on the claim upon which the attachment is based."  Cal. Civ. Code § 484.030.

An application for a writ of attachment can only be granted if the court makes the following findings:

> (1) The claim upon which the attachment is based is one upon which an attachment may be issued.
> (2) The plaintiff has established the probable validity of the claim upon which the attachment is based.
> (3) The attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based.
> (4) The amount to be secured by the attachment is greater than zero.

Cal. Civ. Code § 484.090(a).  The requirements to obtain a writ of attachment are strictly construed.  *See Vershbow v. Reiner*, 231 Cal. App. 3d 879, 882 (1991).

### A.   <u>This Is Not an Action Based on a Contract Where a Writ of Attachment Can Be Issued, So Ca. Civ. Code § 484.020 Is Not Satisfied</u>

California Civil Code § 483.010(a) provides as follows:

> Except as otherwise provided by statute, an attachment may be issued only in an action on a claim or claims for money, each of which is based upon a contract, express or implied, where the total

OPPOSITION
10301465.2

1

> amount of the claim or claims is a fixed or readily ascertainable
> amount not less than five hundred dollars ($500) exclusive of
> costs, interest, and attorney's fees.

2

3

In seeking this relief, the Trustee relies on the first clause of this statute and argues that the

4

relief is warranted under the Uniform Voidable Transactions Act.  The Uniform Voidable

5

Transactions Act provides that "[i]n an action for relief against a transfer or obligation under

6

this chapter, a creditor, subject to the limitations in Section 3439.08, may obtain:  . . .(2) An

7

attachment or other provisional remedy against the asset transferred or other property of the

8

transferee in accordance with the procedures described in Title 6.5 (commencing with Section

9

481.010) of Part 2 of the Code of Civil Procedure, or as may otherwise be available under

10

applicable law."  Cal. Civ. Code § 3439.07(a)(2) (emphasis added).  This section goes on to

11

provide that "[i]f a creditor has commenced an action on a claim against the debtor, the

12

creditor may attach the asset transferred or other property of the transferee if the remedy of

13

attachment is available in the action under applicable law and the property is subject to

14

attachment in the hands of the transferee under applicable law."  Cal. Civ. Code § 3439.07(b)

15

(emphasis added).   These sections must be read together.  *See Moyer v. Workmen's Comp.*

16

*Appeals Bd.*, 10 Cal. 3d 230, 230 (1973).  Reading these provisions together, they do not

17

create an independent basis for a writ of attachment separate from the requirements under Cal.

18

Civ. Code 483.010 *et seq.*   There are only a couple of cases that counsel for Mr. Bayrooti has

19

located that have analyzed a request for a writ of attachment in the context of a fraudulent

20

transfer action.  One is a California case that is unpublished and that is consistent with the

21

foregoing.  *See Kalikas v. American Contractors Indemnity Co.*, 2014 WL 278773 (Cal. Ct.

22

App. Jan. 27, 2014).  Two others involved complaints with causes of action for both breach of

23

contract and fraudulent transfer.  *See, e.g.*, *Travelers Casualty & Surety Co. v. J.K. Merz*

24

*Constructions, Inc.*, 2007 WL 4468680 (N.D. Cal. Dec. 17, 2007); *Wells Fargo Bank, N.A. v.*

25

*Stewart Homes, Inc.*, 2024 WL 2178245 (C.D. Cal. May 2, 2024).

26

        This is a fraudulent transfer action without any contractual component.  Although the

27

transfer that the Trustee seeks to challenge involved a payment made under a stock purchase

28

OPPOSITION

1    agreement and a guarantee, the instant action does not contain a breach of contract claim and

2    is not premised on a contract but is instead equitable in nature.

3      The cases cited by the Trustee do not hold otherwise.  In *Whitehouse v. Six Corp.*, 40

4    Cal. App. 4th 527 (1995), a lienholder filed an action against three companies seeking judicial

5    foreclosure of three parcels and recovery of a deficiency judgment.  When the action was

6    filed, all of the stock in one of the companies, Hill Top, was held by Sammy and Wayne

7    Reeder, who were married.  Subsequently, they divorced.  Six months later, the lienholder

8    sought a writ of attachment for all of the property of one of the entities on the basis that the

9    value of its secured interest was declining and the probable validity of its claim would be

10   upheld.  *Id.* at 531.  The court granted the writ, and it was recorded against the three parcels.

11   In the meantime, Hill Top transferred its interest in the three properties to Sammy Reeder and

12   a wholly-owned subsidiary of Hill Top.  The underlying litigation was settled with a

13   stipulation allowing for entry of judgment against Hill Top and another entity and directing

14   the foreclosure sale of a parcel.  A month later, Sammy and the subsidiary filed a third-party

15   claim of ownership in the parcels, alleging that they had lawfully acquired title to them.  *Id.*

16   The lienholder objected to the claim of ownership on the basis that the conveyance by Hill

17   Top was a fraudulent conveyance.  After an evidentiary hearing, the trial court denied the

18   third-party claim and Sammy Reeder and Hill Top appealed.  *Id.* at 532.

19     The issue in the appeal was whether the trial court improperly placed the burden of

20   proof on the appellants to establish that the conveyance of the properties to them was bona

21   fide.  The issue was not whether or how a party can avail themselves of a writ of attachment

22   in a fraudulent transfer action.  The case is inapposite and the language cited is dicta.

23     In *Cadles of W. Va. v. Alvarez*, 2023 WL 4280786 (S.D. Cal. Jun. 29, 2023), the

24   plaintiff had obtained a judgment based on a contract and then brought a collection action that

25   included a fraudulent transfer claim.  The plaintiff argued that it was entitled to a writ of

26   attachment under Cal. Civ. Code § 3439.07 and the defendants did not take issue with that

27   contention, so the court did not analyze it and accepted the parties' position.  *Id.* at * 19.

28

7

10301465.2

1    Accordingly, because this action is not one where a writ of attachment is an

2  independently available remedy and the action is not one based on a contract, the Motion can

3  be denied on that basis.

4    **B.    The Application Does Not Satisfy Cal. Civ. Code § 483.010(c) Because Mr.**

5    **Bayrooti Is an Individual and the Sale of Stock That He Held Did Not**

6    **Arise Out of the Conduct by Him of a Trade or Business**

7    Section 483.010(c) provides that where the defendant is a natural person, "an

8  attachment may be issued only on a claim which arises out of the conduct by the defendant of

9  a trade, business, or profession." Cal. Civ. Code § 483.010(c). By its terms, this section limits

10  the use of a writ of attachment to claims based on a contract against a defendant engaged in a

11  trade, business, or profession. Here, Mr. Bayrooti was not engaged in business when he sold

12  his shares of stock in BAT. Quite the opposite: he was disengaging from a business or

13  profession. This provision is not satisfied.

14    **C.    The Only Evidence Submitted in Support of the Application Is a**

15    **Declaration That Is Not Based on Personal Knowledge or Admissible**

16    **Evidence**

17    Presumably because of the potentially draconian ramifications of a writ of attachment,

18  California Civil Code § 482.040 provides as follows:

19        The facts stated in each affidavit filed pursuant to this title
      shall be set forth with particularity. Except where matters are
20      specifically permitted by this title to be shown on information and
      belief, each affidavit shall show affirmatively that the affiant, if
21      sworn as a witness, can testify competently to the facts stated
      therein. As to matters shown by information and belief, the
22      affidavit shall state the facts on which the affiant's belief is based,
      showing the nature of his information and the reliability of his
23      informant. . . ."

24  "At a minimum, this means that the affiant or declarant must show actual, personal knowledge

25  of the relevant facts, rather than the ultimate facts commonly found in pleadings, and such

26  evidence must be admissible and not objectionable." *Pos-A-Traction, Inc. v. Kelly-Springfield

27  Tire Co.*, 112 F.Supp.2d 1178, 1182 (C.D. Cal. 2000)(citing Cal. Evid. Code § 702; C.D. Cal.

28  Local Civ. Rule 7.5.3).

8

10301465.2

The Application is wholly unsupported by admissible evidence and therefore falls far short of the requirements of California Civil Code § 482.040.  The only evidence submitted in support of the Application is the Trustee's declaration.  The majority (i.e., 22 of 41 paragraphs) of the Trustee's declaration is based on information and belief, from the allegations about the circumstances surrounding the stock purchase agreement and the payments to the allegations regarding LPG's alleged insolvency when the payment to Mr. Bayrooti was made.  The declaration does not explain the basis for these statements or that the Trustee has personal knowledge of any of the facts and much of it is based on inadmissible hearsay as set forth in the concurrently-filed evidentiary objections.

The Application should be denied on this basis.

**D.**     **The Application Does Not Establish That the Trustee Is Likely to Prevail on the Merits Because There Is Zero Evidence That LPG Was Insolvent When It Guaranteed Mr. Diab's Obligation Under the Stock Purchase Agreement and, in Fact, LPG Received Consideration**

To be entitled to a writ of attachment, the Trustee must establish the probable validity of his claims.  *See* Cal. Civ. Code § 484.090(b).  The plaintiff has the burden of proof on this issue.  The Trustee's wholly deficient declaration does not establish probable validity of success on the complaint.  However, there are other issues.  First, the Trustee testifies (based on information and belief) that LPG was insolvent when it made the payment to Mr. Bayrooti in September 2022 and for an unspecified period of time prior to the payment being made.  However, that payment was made on account of a guarantee entered into more than a year before the payment was made.  Because it was a payment on account of an antecedent debt, value was given and the payment cannot be avoided as a fraudulent transfer.  *See* Cal. Civ. Code § 3439.03 (providing that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt if secured or satisfied . . . ."); *see also Official Comm. Of Unsecured Creditors v. Hancock Park Capial II, L.P. (In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141, 1145-46 (9th Cir. 2013) (holding that payment of a pre-existing debt, which is a transfer made in satisfaction of a claim, is

9

1  reasonably equivalent value that insulates a payment from avoidance as a constructively

2  fraudulent transfer).

3       Instead, the Trustee must establish that LPG's execution of a guarantee in June 2021

4  was a constructively fraudulent transfer.  California law does not require that there be

5  consideration for a guarantee.  *See* Cal. Civ. Code § 2792.  Although this may not mean

6  insulate a guarantee from attack as a constructively fraudulent transfer, to establish that the

7  guarantee is avoidable as a constructively fraudulent transfer, the Trustee must show that LPG

8  was either insolvent or rendered insolvent when it incurred that obligation.  *See* Cal. Civ. Code

9  § 3439.05; 11 U.S.C. § 548.  There is no evidence before the Court, inadmissible or

10  admissible, that LPG was insolvent when it signed the guaranty of Mr. Diab's obligation in

11  June 2021.  The Trustee has not even alleged insolvency in June 2021.  Because there is no

12  evidence, admissible or otherwise, that LPG was insolvent in June 2021 when it signed the

13  guarantee, the Trustee has failed to prove the probable validity of his claim and the

14  Application must be denied.

15       The deficiencies in the Trustee's complaint do not end there.  The Trustee has

16  contended in the most recent amended complaint against Mr. Diab and a number of other

17  defendants that after acquiring Mr. Bayrooti's stock, Mr. Diab merged Coast Processing's

18  operations into LPG's and that prior to that time, "Coast Processing exercised authority,

19  dominion and control over LPG in concert with Diab, and used the dba 'LPG.'"  *See Fourth*

20  *Amended Complaint*, Docket No. 583 in Case 8:23-ap-01046-SC.  A copy of the pertinent

21  pages of this complaint are attached as Exhibit "A."  If Coast Processing and LPG were the

22  same or Coast Processing's business was merged into LPG once Diab acquired Mr. Bayrooti's

23  stock, then LPG received value in exchange for the guarantee and the ensuing payment to Mr.

24  Bayrooti.  When the guarantee was given and the stock conveyed, Coast Processing was quite

25  profitable, as evidenced by the audited financials for Coast Processing for the year-ended

26  December 31, 2020, a copy of which is attached as Exhibit "B" and which reflects

27  shareholders' equity of more than $2 million as of December 31, 2020.  This is evidence that

28  Coast Processing had value when its business was merged into LPG.  Because LPG's

1    guarantee of Mr. Diab's obligation was the basis for Mr. Bayrooti conveying the stock in

2    Coast Processing for LPG's benefit, LPG received value.

3         The Trustee has the burden to prove the probable validity of his claim and has

4    submitted no evidence that LPG was insolvent when it signed the guarantee and, even if he

5    had, the merger of Coast Processing's business into LPG's business was reasonably equivalent

6    value.

7         **E.    The Timing and Deficiencies in the Application Appear to Evidence an**

8         **Improper Intention in Filing the Application**

9         In order to grant a writ of attachment, the Court must also find that "[t]he attachment is

10   not sought for a purpose other than the recovery on the claim upon which the attachment is

11   based." Cal. Civ. Code § 484.090(a)(3).  The timing of this Application, more than two

12   months after the complaint was filed and without any intervening facts or any evidence that

13   there is any legitimacy to the Trustee's feigned concerns about the concealment or transfer of

14   assets, as well as the wholesale deficiencies in the Application, are evidence to Mr. Bayrooti

15   that the Application was not filed to ensure recovery on the claim but is instead being pursued

16   as a litigation tactic to intimidate Mr. Bayrooti.  This deficiency provides yet another ground to

17   deny the Application.

18        **F.    There Is No Great or Irreparable Injury That Would Alternatively Justify**

19        **the Issuance of a Temporary Protective Order**

20        Although the Trustee does not cite the relevant statutes in his Application, he generally

21   requests in the alternative that the Court issue a temporary protective order.  To obtain a

22   temporary protective order, the Trustee must show in the Application that the Trustee will

23   "suffer great or irreparable injury (within the meaning of Section 485.010) if the temporary

24   protective order were not issued." Cal. Civ. Code § 486.010.  Under section 485.010, "great or

25   irreparable injury" is shown if "[u]nder the circumstances of the case, it may be inferred that

26   there is a danger that the property sought to be attached would be concealed, substantially

27   impaired in value, or otherwise made unavailable to levy if issuance of the order were delayed

28   until the matter could be heard on notice."

10301465.2

There is zero evidence that Mr. Bayrooti has or intends to conceal or transfer assets. The sole basis for the relief being sought by the Trustee is that funds in accounts are liquid and that the Property is unencumbered and could be transferred.  This is wholly insufficient and is mere speculation not based on any evidence.  If that were sufficient, then every case would justify the issuance of a writ of attachment or temporary protective order because virtually every defendant has a bank account and many of them own real property that can be conveyed. That is not the test and the Trustee has submitted no evidence that would entitle him to a temporary protective order.

## IV.    IF THE COURT IS INCLINED TO GRANT THE WRIT OF ATTACHMENT, THE UNDERTAKING SHOULD BE SIGNIFICANTLY HIGHER THAN $10,000

Prior to issuance of a writ of attachment or temporary protective order, a plaintiff must file an undertaking to pay the defendant any amount that the defendant might recover for any wrongful attachment.  *See* Cal. Civ. Code § 489.210. Section 489.220 of the California Civil Code provides that the amount of the undertaking is $10,000, except that "[i]f upon objection to the undertaking, the court determines that the probable recovery for wrongful attachment exceeds the amount of the undertaking, it shall order the amount of the undertaking increased to the amount it determines to be the probable recovery for the wrongful attachment if it is ultimately determined that the attachment was wrongful."

The Trustee seeks to attach or freeze Mr. Bayrooti's bank accounts and the assets of his trust, including the Property, in the amount of $5,814,146.45.  Without access to these funds, Mr. Bayrooti will be unable to pay for his living expenses, the living expenses of his family, or even the defense of this action.  If and when he prevails after the after an attachment is issued, he will have suffered substantial damages, both because he will be left without the ability to fund his expenses and because his credit will be damaged by the issuance of the writ of attachment.  Accordingly, the amount of the proposed undertaking is totally deficient and

10301465.2

1   should be significantly increased and Mr. Bayrooti would request a subsequent hearing to

2   consider the appropriate amount of the undertaking.

3

4   **V.    THE DEFENDANT IS ENTITLED TO EXEMPTIONS**

5        If the Court is inclined to issue a writ of attachment against Mr. Bayrooti's bank

6   accounts, then he is entitled to claim the appropriate exemptions under California law and

7   intends to do so.  *See* Cal. Civ. Code § 484.050(f).

8

9   **VI.    CONCLUSION**

10       Because the Application is not supported by a declarant with personal knowledge,

11  lacks any evidence on key issues, and does not satisfy the requirements for the issuance of a

12  writ of attachment or temporary protective order, much less on 48 hours' notice, the

13  Application should be denied.

                                    Respectfully submitted,

14

15  Dated:  August 15, 2024              RAINES FELDMAN LITTRELL LLP

16

17                                  By: */s/ Kyra E. Andrassy*
                                        Kyra E. Andrassy
18                                      Attorneys   for   Defendant   Arash   Asante
                                        Bayrooti
19

20

21

22

23

24

25

26

27

28

OPPOSITION

10301465.2

1

## DECLARATION OF KYRA E. ANDRASSY

2       I, Kyra E. Andrassy, hereby declare and state as follows:

3       1.      I am an attorney at law duly licensed to practice before this Court and all courts

4  in the State of California. I am a partner in the law firm of Raines Feldman Littrell LLP, co-

5  counsel for Defendant Arash Asante Bayrooti.  Based on my personal knowledge, I assert the

6  facts set forth herein and, if called upon as a witness, I could and would competently testify

7  thereto.

8       2.      Attached hereto is a true and correct copy of excerpts from the *Fourth Amended*

9  *Complaint* filed by Richard A. Marshack, as chapter 11 trustee of Litigation Practice Group

10  P.C., against a number of defendants, including Tony Diab.  I obtained this pleading from

11  Pacer on August 14, 2024.

12      I declare under penalty of perjury, under the laws of the State of California, that the

13  foregoing is true and correct.

14      Executed on August 15, 2024, at Costa Mesa, California.

15                                          /s/ Kyra E. Andrassy

16

17

18

19

20

21

22

23

24

25

26

27

28

14

10301465.2

1

### DECLARATION OF ARASH ASANTE BAYROOTI

2      I, Arash Asante Bayrooti, declare as follows:

3      1.      I am an individual and the Defendant in the above-entitled action.  I make this

4   declaration in support of my opposition to the emergency motion for a writ of attachment.  I

5   have personal knowledge of the facts set forth herein, and if called upon to testify thereto, I

6   could and would competently do so under oath.

7      2.      I first learned that Richard Marshack, who I understand is the chapter 11 trustee

8   of Litigation Practice Group, believed that he had claims against me for a payment that I

9   received from Litigation Practice Group in approximately September 2023.  I subsequently

10  engaged counsel who engaged in discussions with counsel for Mr. Marshack in an attempt to

11  resolve the claims without the need for litigation.  Unfortunately, that did not occur, and I

12  understand that Mr. Marshack initiated this action in June 2024.  Although I was served with

13  the original complaint, as of August 15, 2024, I have not received the service copy of the

14  amended complaint.

15     3.      The accounts that I use to pay my living expenses and obligations are those

16  referenced in the Application.  Without access to them, I would not be able to pay for basic

17  living expenses, much else any other obligations that I have, including the defense of this

18  action, the tuition and living expenses for my daughter in college, and support of my ex-wife.

19     4.      Prior to 2021, I was a shareholder and officer in B.A.T., Inc. dba Coast

20  Processing.  In those capacities, I had access to its financial records and was one of the

21  custodian of records.  Attached as Exhibit "B" is a true and correct copy of audited financials

22  for the year-ended December 31, 2020, just before I sold my shares.  These financials are

23  business records that were maintained in the ordinary course of Coast Processing's business.

24     I declare under penalty of perjury under the laws of the State of California that the

25  foregoing is true and correct.

26     Executed on August 15, 2024, at Anaheim, California.

27

28                                          _____
                                            Arash Asante Bayrooti

OPPOSITION

10301465.2

1        **DECLARATION OF ARASH ASANTE BAYROOTI**

2        I, Arash Asante Bayrooti, declare as follows:

3        1.       I am an individual and the Defendant in the above-entitled action. I make this

4    declaration in support of my opposition to the emergency motion for a writ of attachment. I

5    have personal knowledge of the facts set forth herein, and if called upon to testify thereto, I

6    could and would competently do so under oath.

7        2.       I first learned that Richard Marshack, who I understand is the chapter 11 trustee

8    of Litigation Practice Group, believed that he had claims against me for a payment that I

9    received from Litigation Practice Group in approximately September 2023. I subsequently

10   engaged counsel who engaged in discussions with counsel for Mr. Marshack in an attempt to

11   resolve the claims without the need for litigation. Unfortunately, that did not occur, and I

12   understand that Mr. Marshack initiated this action in June 2024. Although I was served with

13   the original complaint, as of August 15, 2024, I have not received the service copy of the

14   amended complaint.

15       3.       The accounts that I use to pay my living expenses and obligations are those

16   referenced in the Application. Without access to them, I would not be able to pay for basic

17   living expenses, much else any other obligations that I have, including the defense of this

18   action, the tuition and living expenses for my daughter in college, and support of my ex-wife.

19       4.       Prior to 2021, I was a shareholder and officer in B.A.T., Inc. dba Coast

20   Processing. In those capacities, I had access to its financial records and was one of the

21   custodian of records. Attached as Exhibit "B" is a true and correct copy of audited financials

22   for the year-ended December 31, 2020, just before I sold my shares. These financials are

23   business records that were maintained in the ordinary course of Coast Processing's business.

24       I declare under penalty of perjury under the laws of the State of California that the

25   foregoing is true and correct.

26       Executed on August 15, 2024, at Anaheim, California.

27

28                                          Arash Asante Bayrooti

                                       15
                                 **OPPOSITION**
10301465.2

# EXHIBIT "A"

1  CHRISTOPHER B. GHIO (259094)
   Christopher.Ghio@dinsmore.com
2  JEREMY B. FREEDMAN (308752)
   Jeremy.Freedman@dinsmore.com
3  DINSMORE & SHOHL LLP
   655 West Broadway, Suite 800
4  San Diego, California 92101
   Tele: 619.400.0500
5  Fax:  619.400.0501
6  Special Counsel to Richard A. Marshack, Chapter 11 Trustee for the Bankruptcy Estate of The
7  Litigation Practice Group P.C.

8                  **UNITED STATES BANKRUPTCY COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA (SANTA ANA DIVISION)**

10

11  In re:                                    Case No. 8:23-bk-10571-SC

12  THE LITIGATION PRACTICE GROUP, PC,        Adv. Proc. No. 8:23-ap-01046-SC

13                  Debtor.                    Chapter 11

14

15  ─────────────────────────────            **FOURTH AMENDED COMPLAINT
                                              FOR:**
16  RICHARD A. MARSHACK,
    Chapter 11 Trustee,                       **(1)    INJUNCTIVE RELIEF;**
17
                    Plaintiff,                 **(2)    AVOIDANCE, RECOVERY, AND
18                                                     PRESERVATION OF TWO-YEAR
    v.                                                 ACTUAL FRAUDULENT
19                                                     TRANSFERS;**
    TONY DIAB, an individual; DANIEL S.
20  MARCH, an individual; ROSA BIANCA LOLI,   **(3)    AVOIDANCE, RECOVERY, AND
    an individual; LISA COHEN, an individual;         PRESERVATION OF TWO-YEAR
21  WILLIAM TAYLOR CARSS, an individual;              CONSTRUCTIVE FRAUDULENT
    ENG TAING, an individual; HENG TAING, an           TRANSFERS;**
22  individual; MARIA EEYA TAN, an individual;
    JAKE AKERS, an individual; HAN TRINH, an  **(4)    AVOIDANCE, RECOVERY, AND
23  individual; JAYDE TRINH, an individual; WES        PRESERVATION OF FOUR-
    THOMAS, an individual; SCOTT JAMES                 YEAR ACTUAL FRAUDULENT
24  EADIE, an individual; JIMMY CHHOR, an              TRANSFERS;**
    individual; DONGLIANG JIANG, an individual;
25  MAX CHOU, an individual; OAKSTONE LAW     **(5)    AVOIDANCE, RECOVERY, AND
    GROUP PC; GREYSON LAW CENTER PC;                  PRESERVATION OF FOUR-
26  PHOENIX LAW, PC; MAVERICK                          YEAR CONSTRUCTIVE
    MANAGEMENT GROUP, LLC; LGS                         FRAUDULENT TRANSFERS;**
27  HOLDCO, LLC; CONSUMER LEGAL
    GROUP, P.C.; VULCAN CONSULTING          **(6)    TURNOVER; AND**
28
                                              **(7)    NEGLIGENCE**

                                1

| | |
|---|---|
| 1 | GROUP LLC; BAT INC. d/b/a COAST PROCESSING; PRIME LOGIX, LLC; |
| 2 | TERACEL BLOCKCHAIN FUND II LLC; EPPS; EQUIPAY; AUTHORIZE.NET; WORLD |
| 3 | GLOBAL; OPTIMUMBANK HOLDINGS, INC. d/b/a OPTIMUM BANK; MARICH BEIN, |
| 4 | LLC; BANKUNITED, N.A.; REVOLV3, INC.; FIDELITY NATIONAL INFORMATION |
| 5 | SERVICES, INC. d/b/a FIS; WORLDPAY, |
| 6 | LLC; WORLDPAY GROUP; MERIT FUND, LLC; GUARDIAN PROCESSING, LLC; |
| 7 | PAYLIANCE, LLC; TOUZI CAPITAL, LLC; SEAMLESS CHEX INC; DWOLLA, INC.; |
| 8 | STRIPE, INC.; and DOES 1 through 100, |
| 9 | inclusive, |
| 10 | Defendants. |

2

**B.    LPG'S OWNERSHIP AND MANAGEMENT**

40.    After being disbarred in both California and Nevada for forging a judge's signature and stealing large amounts of client funds, Diab transferred his existing debt resolution practice to LPG. LPG was a law firm that provided consumer debt resolution. LPG serviced more than 50,000 customers across the United States, with annual revenue estimated to total $150,000,000 in 2022.

41.    Despite having been disbarred, Diab controlled and operated LPG since its inception. Diab, however, endeavored to and did conceal his control of LPG. For example, Diab required LPG's employees to call him "Admin," and the name plate on his desk reads, "I don't work here."

42.    To pull this off, Diab rented the law license of March who, at times, masqueraded as the managing partner of LPG but exercised no actual management or control. In fact, Diab sometimes impersonated March and regularly signed March's signature on contracts. LPG's primary DocuSign account was tied to Diab's email address, admin@lpglaw.com, where Diab signed numerous contracts as March. For use of March's law license, March received an annual salary of $600,000 or more, in addition to bonuses and other forms of benefits and compensation.

43.    March's predecessor at LPG was John Thompson. Thompson was the original sole shareholder of LPG from February 2019 to November 2019 and was put in place to hide Diab's control over LPG. Appreciating the wrongful conduct alleged herein, Thompson conveyed his interest in LPG to March in November 2019 over concerns about his and LPG's potential liability. Similar to impersonating March, Diab also impersonated Thompson on many matters, giving legal advice to clients in an attorney capacity, including but not limited to signing certain Service Applications and Service Agreements submitted by LPG to Credit Reporting Services, LLC, among many others.

**C.    LPG'S BUSINESS STRUCTURE**

44.    Historically, LPG had a business partner called Coast Processing, which was owned by Brian Real, Arash Asante Bayrooti, and Diab. Coast Processing was one entity through which LPG ran its in-house marketing and client development operations, among other operational functions at LPG such as backend processing. LPG, however, also had a network of over 100 marketing affiliates from which LPG purchased new clients. In 2021, Diab bought out the other investors in Coast Processing and merged its operations with LPG, including Coast Processing's contracts with other

marketing affiliates. Despite Coast Processing's operations being merged into LPG, Coast Processing exists as a California corporation in good standing. At all relevant times prior to the buyout, Coast Processing exercised authority, dominion and control over LPG in concert with Diab, and used the dba "LPG."

45.    Marketing affiliates referred clients to LPG. The marketing affiliates located clients who were victims of predatory lending or who were subject to claims for large debt that are not legally valid under applicable law. After taking on these clients, LPG paid the marketing affiliates a percentage of the fees earned through the debt resolution process in order to avoid a large upfront cost and spread the risk of non-payment by the client in the future to the marketing affiliate who signed up the client.

46.    LPG clients pay fees to LPG over a period of time, ranging from 18 to 30 months, through monthly debits from their bank accounts. The monthly debits were controlled by Diab, LPG, and at times, as alleged herein, other entities who fraudulently initiated ACH transactions on LPG clients and/or with whom Diab had control, influence and/or had conspired to use to effectuate the fraudulent transfers of client files and funds as alleged herein. Each set of payments due by a client is referred to as an "ACH receivable."

47.    Once a new client had signed up, executed the retainer and payment plan contract, and provided bank ACH information, LPG was responsible for servicing the client file. To this end, LPG utilized software such as DebtPayPro ("DPP") and, more recently, cobbled together a less efficient proprietary software known as LUNA to automate the dispute process, facilitate client communications, and track payment information. For instance, the correspondence sent on behalf of clients to creditors, collection agencies, and/or credit bureaus are automated and generic templates sent via U.S. Mail, facsimile, and/or email. Some cases result in the disputed debt being corrected on the client's credit report, some result in successful challenges based on consumer protection laws, and others result in debt settlement, which the client is responsible to pay in addition to the payment plan. In limited instances, LPG will file a lawsuit in an effort to eliminate a disputed debt. Creating proprietary systems such as LUNA also facilitated Diab's scheme and LPG's fraudulent transfers of client files, ACH information, and ACH debit processing to Phoenix; Prime Logix; Greyson; CLG;

EXHIBIT "B"



**B.A.T. INC. DBA COAST PROCESSING**

**FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED DECEMBER 31, 2020**
**WITH INDEPENDENT AUDITOR'S REPORT**

**Kieckhafer**
**Schiffer** LLP

*Independent Auditor's Report*

To the Stockholders
B.A.T. Inc. dba Coast Processing

We have audited the accompanying financial statements of B.A.T. Inc. dba Coast Processing which comprise the balance sheet as of December 31, 2020, and the related statements of income, changes in stockholders' equity, and cash flows for the year ended December 31, 2020, and the related notes to the financial statements.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditor's Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit.   We conducted our audit in accordance with auditing standards generally accepted in the United States of America.   Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error.   In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control.   Accordingly, we express no such opinion.   An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.



*Opinion*

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of B.A.T. Inc. dba Coast Processing as of December 31, 2020, and the results of their operations and their cash flows for the year ended December 31, 2020 in accordance with accounting principles generally accepted in the United States of America.

*Change in Accounting Principle*

As discussed in Note 1 to the financial statements, the Company has changed its method of accounting for revenue recognition effective January 1, 2019 due to the adoption of Accounting Standards Update No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*, and all related amendments.

KIECKHAFER SCHIFFER LLP

Irvine, California

March 5, 2021

**B.A.T. INC. DBA COAST PROCESSING**
**BALANCE SHEET**
**AS OF DECEMBER 31, 2020**

## ASSETS

CURRENT ASSETS:

| | |
|---|---:|
| Cash | $ 2,757,798 |
| Accounts receivable | 902,227 |
| Related-party receivables | 17,414 |
| Total current assets | 3,677,439 |
| PROPERTY AND EQUIPMENT, net | 355,433 |
| NOTES RECEIVABLE - RELATED-PARTIES | 271,000 |
| Total assets | $ 4,303,872 |

## LIABILITIES AND STOCKHOLDERS' EQUITY

CURRENT LIABILITIES:

| | |
|---|---:|
| Accounts payable | $ 1,559,509 |
| Accrued expenses | 139,212 |
| Other payables | 58,551 |
| Total current liabilities | 1,757,272 |
| LONG-TERM LIABILITIES: | |
| Paycheck protection program loan | 294,860 |
| Total liabilities | 2,052,132 |

COMMITMENTS (NOTE 5)

STOCKHOLDERS' EQUITY:

| | |
|---|---:|
| Common stock, no par value | |
| 100 shares, authorized, issued and outstanding | 54,950 |
| Retained earnings | 2,196,790 |
| Total stockholders' equity | 2,251,740 |
| Total liabilities and stockholders' equity | $ 4,303,872 |

See accompanying notes and independent auditor's report.

3

**B.A.T. INC. DBA COAST PROCESSING**
**STATEMENT OF INCOME**
**FOR THE YEAR ENDED DECEMBER 31, 2020**

| | |
|---|---:|
| REVENUES | $ 31,941,602 |
| COST OF SERVICES | 22,069,223 |
| Gross profit | 9,872,379 |
| OPERATING EXPENSES: | |
| Selling and marketing | 186,882 |
| General and administrative | 5,369,458 |
| Depreciation expense | 41,742 |
| Total operating expenses | 5,598,082 |
| Income from operations | 4,274,297 |
| OTHER INCOME (EXPENSE): | |
| Other income | 38,138 |
| Interest expense | (1,009) |
| Total other income | 37,129 |
| Income before provision for franchise tax | 4,311,426 |
| PROVISION FOR FRANCHISE TAX | 64,671 |
| Net income | $  4,246,755 |

See accompanying notes and independent auditor's report.

4

**B.A.T. INC. DBA COAST PROCESSING**
**STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY**
**FOR THE YEAR ENDED DECEMBER 31, 2020**

| | Common Stock | | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|
| | Shares | Amount | | |
| BALANCE, December 31, 2019 | 100 | $ 54,950 | $   263,640 | $    318,590 |
| Net income | - | - | 4,246,755 | 4,246,755 |
| Distributions | - | - | (2,313,605) | (2,313,605) |
| BALANCE, October 31, 2020 | 100 | $ 54,950 | $ 2,196,790 | $ 2,251,740 |

See accompanying notes and independent auditor's report.

5

**B.A.T. INC. DBA COAST PROCESSING**
**STATEMENT OF CASH FLOWS**
**FOR THE YEAR ENDED DECEMBER 31, 2020**

| | |
|---|---:|
| CASH FLOWS FROM OPERATING ACTIVITIES: | |
| Net income | $ 4,246,755 |
| Adjustments to reconcile net income to net cash provided by operating activities: | |
| Depreciation | 41,742 |
| Changes in operating assets and liabilities: | |
| (Increase) decrease in accounts receivable | (709,001) |
| (Increase) decrease in related-party receivables | (17,414) |
| Increase (decrease) in accounts payable | 1,010,149 |
| Increase (decrease) in accrued expenses | 139,212 |
| Increase (decrease) in other payables | 31,785 |
| Net cash provided by operating activities | 4,743,228 |
| | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | |
| Loans to related-parties | (271,000) |
| Cash payments for the purchase of property and equipment | (312,925) |
| Net cash used in investing activities | (583,925) |
| | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | |
| Distributions to stockholders | (2,313,605) |
| Proceeds from the paycheck protection program loan | 294,860 |
| Net cash used in financing activities | (2,018,745) |
| | |
| NET INCREASE IN CASH | 2,140,558 |
| | |
| CASH, beginning of year | 617,240 |
| | |
| CASH, end of year | $ 2,757,798 |
| | |
| SUPPLEMENTAL CASH FLOW INFORMATION: | |
| Cash paid during the year for: | |
| Interest | $ 1,009 |
| | |
| State franchise taxes | $ 5,544 |

See accompanying notes and independent auditor's report.

**B.A.T. INC. DBA COAST PROCESSING**
**NOTES TO THE FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED DECEMBER 31, 2020**

1. **Summary of Operations and Significant Accounting Policies**

   a. Company Operations
   B.A.T. Inc. dba Coast Processing (the "Company") is an administrative support and processing company dedicated to supporting law firms that operate high volume debtors' rights legal representation. The Company includes in their services a wide range of tasks such as mail processing, document and file management, payment processing, customer service and support, client relations management, data entry, word processing, bookkeeping, and after hours support.

   b. Formation
   The Company was initially organized on January 10, 2018 as a Limited Liability Company ("LLC") and on May 14, 2019 converted to a California S Corporation for income tax purposes.

   c. Basis of Presentation
   The Company follows accounting standards set by the Financial Accounting Standards Board (the "FASB"), which establishes generally accepted accounting principles ("GAAP") that are followed in reporting financial condition, results of operations, and cash flows. References to GAAP issued by the FASB in these notes are to the FASB Accounting Standards Codification ("ASC").

   d. Recently Adopted Accounting Guidance
   In May 2014, the FASB issued a new standard related to revenue recognition, Accounting Standards Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*. This standard outlines a single, comprehensive model for entities to use in accounting for revenue arising from contracts with customers and supersedes most current revenue recognition guidance. The core principle of the revenue model is that an entity recognizes revenue to depict the transfer of promised goods and services in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods and services. The new revenue standard also requires that reporting entities disclose the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers.

   The new revenue standard is required to be applied either retrospectively to each prior reporting period presented or prospectively with the cumulative effect of initially applying the standard recognized at the date of the initial application, supplemented with certain disclosures related to the effect of adoption on previously reported amounts, if any (the modified retrospective method). The Company adopted the new revenue standard on January 1, 2019.

7

The Company has evaluated the effect of the standard and concluded it is not material to the timing or amount of revenues or expenses recognized in the Company's historical financial statements.  As a result, the Company has concluded that the application of the standard does not have a material effect that requires a retrospective adjustment to any previously reported amounts in the Company's historical financial statements for reporting disclosure purposes.

e.     Recently Issued Accounting Pronouncements
In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)*, aimed at making leasing activities more transparent and comparable.  The new standard requires substantially all leases be recognized by lessees on their balance sheet as a right-of-use asset and corresponding lease liability, including leases currently classified as operating leases.  ASU 2016-02 is effective for fiscal years beginning after December 15, 2021 and early adoption is permitted.  The Company is currently evaluating the impact of ASU 2016-02 on its financial statements and related disclosures.

f.     Revenue Recognition
The Company records revenue under ASU 2014-09 Topic 606 based on the five-step model which includes: (1) identifying the contract with the customer; (2) identifying the performance obligations in the contract; (3) determining the transaction price; (4) allocating the transaction price to the performance obligations; and (5) recognizing revenue when the performance obligations are satisfied.  Under Topic 606, the Company recognizes revenue when control of the promised service is transferred to the Company's clients, in an amount that reflects the consideration expected in exchange for the services. Substantially all of the Company's revenue is generated from administrative support and processing services to one law firm. Revenue is measured as the net amount of consideration expected to be received in exchange for fulfilling a performance obligation.  In assessing whether collection of consideration from a client is probable, the Company considers the client's ability and intent to pay that amount of consideration when it is due.

g.     Concentrations of Credit Risk
Financial instruments that potentially subject the Company to concentrations of credit risk consist primarily of demand deposits with a bank.  The Company occasionally maintains balances in excess of the federally insured limit set by the Federal Deposit Insurance Corporation ("FDIC").  However, it restricts temporary cash investments to financial institutions with a high credit standing.  Management believes that the Company is not exposed to any significant credit risk related to those accounts.

For the year ended December 31, 2020, the Company derived all of its revenue from services provided to one law firm client. The loss of this law firm client could result in a material adverse effect on the Company's business, financial condition, and results of operations until services with other law firms can be established.

Management believes that the services that the Company performs could be generated through other law firms if the current law firm that the Company is working with stops doing business with them.  As of December 31, 2020 all of the Company's accounts receivable was due from this law firm client.

For the year ended December 31, 2020, $9,081,020 or 42% of the Company's total cost of services were generated though two vendors. As of December 31, 2020 there was no outstanding accounts payable related to these vendors. Management believes that the risk of loss resulting from disruption to operations related to this concentration would be minimal since other vendors are available to perform similar services.

h.    Accounts Receivable and Allowance for Doubtful Accounts
Accounts receivable are stated at the amount management expects to collect on balances outstanding at year-end.  As all accounts receivable are from one law firm client, management believes the risk of loss is minimal and no interest is charged.  Therefore, no allowance for doubtful accounts was recorded in the accompanying financial statements.

i.    Property and Equipment
Property and equipment are recorded at cost.  Expenditures for major additions and improvements are capitalized and minor replacements, maintenance and repairs are charged to expense as incurred.  When property and equipment are retired or otherwise disposed of, the cost and accumulated depreciation are removed from the accounts and any resulting gain or loss is included in the results of operations for the respective period.

The Company provides for depreciation based on the estimated useful lives of depreciable assets using the straight-line method for financial reporting purposes and primarily accelerated methods for tax purposes.  Estimated useful lives are as follows:

| | |
|---|---|
| Furniture and fixtures | 7 years |
| Computers, equipment and software | 5 to 7 years |
| Leasehold improvements | Lesser of useful life of asset or term of lease. |

j.    Advertising and Promotion Costs
Advertising costs are expensed as incurred and were $186,882 for the year ended December 31, 2020.  Advertising and promotion costs are included in the selling and marketing expenses in the statement of income.

k.    Taxes

The Company is an S corporation under the Internal Revenue Code and state of California legislation pursuant to which income taxes are primarily the responsibility of the stockholders.  The state of California imposes a franchise tax equal to 1.5% of taxable income, subject to a minimum of $800.

The Company accounts for income taxes under the liability method required by ASC 740, *Accounting for Income Taxes*.  Deferred income taxes reflect the net effects of temporary differences between the carrying amounts of assets and liabilities for financial statement purposes and the amounts used for income tax purposes.  The deferred tax amounts are measured using the enacted tax rates and laws that are expected to be in effect when the differences are expected to reverse.  As of December 31, 2020, the deferred income taxes were immaterial to the financial statements. The Company adopted the standard of *Accounting for Uncertainty in Income Taxes* under the provisions of ASC 740, which defines the thresholds for recognizing the benefits of tax return positions in the financial statements as "more-likely-than-not" to be sustained by the taxing authority. The Company performed evaluations of the tax positions presented in the current financial statements and has determined that there is no material effect on the Company's income or financial position from the requirements of ASC 740.

l.    Use of Estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

m.    Statement of Cash Flows

For purposes of the statement of cash flows, the Company considers all highly liquid investment instruments with an original maturity of three months or less to be cash equivalents.

n.    Subsequent Events

The Company has evaluated subsequent events through March 5, 2021, the date the financial statements were available for issuance.

2.  **Property and Equipment**

Property and equipment consisted of the following as of December 31, 2020:

| | | |
|---|---|---:|
| Furniture and fixtures | $ | 45,263 |
| Computers, equipment and software | | 152,491 |
| Leasehold improvements | | 202,894 |
| Total property and equipment | | 400,648 |
| Less: accumulated depreciation | | (45,215) |
| Property and equipment, net | $ | 355,433 |

For the year ended December 31, 2020, depreciation expense was $41,742.

3.  **Notes Receivable - Related-Parties**

Notes receivable consisted of the following as of December 31, 2020:

| | |
|---|---:|
| Non-interest bearing note receivable due from the Company's CEO. The note is due March 1, 2027. | $ 153,000 |
| Non-interest bearing note receivable due from the Company's CFO. The note is due March 1, 2027. | 118,000 |
| Total related-party notes receivable | $ 271,000 |

4.  **Paycheck Protection Program Loan**

In May 2020, the Company was approved by Union Bank for a loan of $294,860 under the Paycheck Protection Program offered by the Small Business Administration ("SBA") under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). The loan bears a 1% interest rate over a two year period and is subject to partial or full forgiveness, the terms of which are dictated by the SBA and CARES Act guidelines. The Company's management believes it has used the loan proceeds for purposes consistent with the PPP requirements and applied for loan forgiveness. The PPP loan forgiveness application was approved by Union Bank in January 2021.

5. **Commitments**

The Company conducts its operations from a leased facility. The operating lease requires monthly payments in the amounts ranging from $10,575 to $14,192 and expires on December 31, 2022. The Company has the option to extend the lease for an additional 12 months.

The following is a schedule of future minimum rental payments required under the operating lease as of December 31, 2020:

| | | |
|---|---|---:|
| 2021 | $ | 175,419 |
| 2022 | | 180,790 |
| Total | $ | 356,209 |

For the year ended December 31, 2020, total building rent expense was $182,867.

6. **Contingencies**

In the normal course of business, the Company enters into contracts and agreements with vendors. These agreements commit the Company to various contingent obligations. The Company is also subject to legal proceedings, claims, and assessments that arise in the ordinary course of business. Management believes that these obligations will not have a material impact on the Company's financial position or its results of operations.

7. **Related-Party Transactions and Balances**

The following transactions were carried out with related-parties during the year ended December 31, 2020:

Transactions:

| | |
|---|---:|
| Services received from ABR and ABR Enterprises, LLC, entities owned by two of the Company's stockholders. | $ 144,626 |
| Services received from Arsha Corp, an entity owned by one of the Company's stockholders. | 320,000 |
| Services received from Azevedo Solution Group, an entity owned by one of the Company's stockholders. | 454,265 |
| Consulting services received from Big Time Digital, LLC, an entity owned by a family member of one of the Company's stockholders. | 72,000 |

12

<u>Transactions (continued):</u>

| | |
|---|---|
| Consulting services received from Leap Forward Financial, an entity owned by one of the Company's stockholders. | $ 44,989 |
| Consulting services received from a family member of one of the Company's stockholders. | 66,000 |
| Consulting services received from Reale Marketing, Inc., an entity owned by one of the Company's stockholders. | 15,787 |

<u>Balances:</u>

| | |
|---|---|
| Reimbursement due from Arsha Corp., an entity owned by one of the Company's stockholders. | $ 17,414 |
| Related-party notes receivable (see Note 3). | 271,000 |
| Amount owed to Azevedo Solution Group for consulting services performed. Amount is included in accounts payable on the accompanying balance sheet. | 74,358 |
| Amount owed to the CFO of the Company for reimbursement of expenses. Amount is included in accounts payable on the accompanying balance sheet. | 2,521 |
| Amount owed to Leap Forward Financial for consulting services performed. Amount is included in accounts payable on the accompanying balance sheet. | 394 |
| Amount owed to Lifetime Flooring, an entity owned by one of the Company's stockholders for leasehold improvement services performed. Amount is included in accounts payable on the accompanying balance sheet. | 42,325 |
| Amount owed to Reale Marketing, Inc. for consulting services performed. Amount is included in accounts payable on the accompanying balance sheet. | 4,772 |

8.  **Risk and Uncertainties**

<u>Impact from the "Coronavirus"</u>
The Company's operations could be materially affected by the risks, or the public perception of the risks, related to a pandemic, outbreak or other public health crisis, such as the recent outbreak of the Coronavirus ("COVID-19"). The extent of the impact of any pandemic, outbreak or other health crisis on the Company's business, financial condition and results of operations will depend on future

developments, which are highly uncertain at this time and cannot be predicted, including new information that may emerge concerning the severity of such pandemic, outbreak or other health crisis and actions taken to contain or prevent their further spread, among others. These and other potential impacts of a pandemic, outbreak or other health crisis, such as COVID-19, could therefore materially affect the Company's business, financial condition and results of operations. Management continues to address the impact of the Coronavirus on its future operations and will take certain actions to address and mitigate the impact if needed.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**3200 Park Center Drive, Suite 250, Costa Mesa, CA 92626**

A true and correct copy of the foregoing document entitled (*specify*): **OPPOSITION TO EMERGENCY MOTION FOR APPLICATION FOR A RIGHT TO ATTACH ORDER AND ISSUANCE OF WRIT OF ATTACHMENT OR, ALTERNATIVELY, FOR A TEMPORARY PROTECTIVE ORDER PENDING A NOTICED HEARING** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **8/15/2024**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **8/15/2024**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **8/15/2024**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| **8/15/2024** | Ja'Nita Fisher | */s/ Ja'Nita Fisher* |
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**

1. **<u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:

- **Kyra E Andrassy   kandrassy@raineslaw.com, bclark@raineslaw.com;jfisher@raineslaw.com**
- **Christopher Ghio   christopher.ghio@dinsmore.com, angelica.urena@dinsmore.com**
- **Richard A Marshack (TR)   pkraus@marshackhays.com, ecf.alert+Marshack@titlexi.com**
- **Tyler Powell   tyler.powell@dinsmore.com, jennifer.pitcock@dinsmore.com;caitlin.brock@dinsmore.com**
- **Matthew J Stockl   matthew.stockl@dinsmore.com, katrice.ortiz@dinsmore.com**
- **United States Trustee (SA)   ustpregion16.sa.ecf@usdoj.gov**

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**